DONALD J. KENNEY AND LINDA L. KENNEY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Kenney v. Commissioner
Docket No. 24360-93.
United States Tax Court
T.C. Memo 1995-431; 1995 Tax Ct. Memo LEXIS 432; 70 T.C.M. (CCH) 614; September 6, 1995, Filed *432 Decision will be entered under Rule 155. Gregory A. Robinson and Gary L. Lodmell, for petitioners. Brad S. Ostroff and Martha Combellick Patrick, for petitioner Linda L. Kenney with respect to the innocent spouse issue. Ann M. Welhaf, for respondent. LARO, Judge LARO
MEMORANDUM FINDINGS OF FACT AND OPINION LARO, Judge: Donald J. Kenney and Linda L. Kenney petitioned the Court to redetermine respondent's determinations with respect to their 1989 and 1990 taxable years. Respondent determined the following Federal income tax deficiencies and accuracy-related penalties for those years: Penalty
Year
Deficiency
Sec. 6662(a) and (b)(1)
1989
$ 1,478,397
$ 174,398
1990
295,679
34,880
Following concessions by both parties, we must decide: 1. Whether the Money Purchase Plan (MPP) and the Profit Sharing Plan (PSP) of Donald J. Kenney, Ltd. (Corporation), were disqualified as of January 1, 1989, for failing to meet the coverage rules of sections 401(a)(3) and (26), and 410(b). We hold they were; accordingly, petitioners' 1989 gross income is increased by $ 695,754 to reflect the December 31, 1989, fair market value of the assets in the Plans. *433 2. Whether petitioners' 1989 gross income includes distributions made by the Plans to Mr. Kenney or to certain related entities. [1] We hold it does; accordingly, petitioners' 1989 gross income is increased by $ 1,547,537 to reflect these distributions. 3. Whether petitioners' 1989 and 1990 gross incomes include moneys they received from sources other than the Plans, and that Mr. Kenney deposited into the Plans. We hold they do; accordingly, petitioners' 1989 and 1990 gross incomes are increased by $ 602,269 and $ 453,060, respectively, to reflect these amounts. 4. Whether petitioners are liable for the accuracy-related penalties for negligence for the 1989 and 1990 taxable years. See sec. 6662(a) and (b)(1). We hold they are. 5. Whether Mrs. Kenney is an "innocent spouse" under section 6013(e) in petitioners' 1989 or 1990 taxable year. We *434 hold she is not in either year. Section references, unless otherwise stated, are to the Internal Revenue Code in effect for the years in issue. Rule references are to the Tax Court Rules of Practice and Procedure. Dollar amounts are rounded to the nearest dollar. The term "Plans" refers collectively to the MPP and the PSP. We separately refer to Donald J. Kenney and Linda L. Kenney as Mr. Kenney and Mrs. Kenney, respectively. FINDINGS OF FACT [2]
*435 The parties have filed with the Court stipulations of certain facts. These facts, and the exhibits submitted therewith, are incorporated herein by this reference. Petitioners resided in Phoenix, Arizona, when they petitioned the Court. 1. Overview of Petitioners
a. Mr. Kenney
Mr. Kenney graduated with the highest honors from Brigham Young University in 1959, majoring in accounting and minoring in real estate finance. He graduated with high honors from the University of Arizona Law School in 1963. He received a master of laws degree in taxation from the University of Southern California in 1964. Mr. Kenney's work experience includes employment in the fields of accounting, law, tax, real estate, and legislation. He worked in the audit and tax divisions of three major accounting firms. He worked as an attorney for the Internal Revenue Service, having been admitted to practice law in the State of Arizona. He worked at a private law firm, practicing commercial litigation, business transactions, mortgage foreclosures, and probate. He operated his own law firm. He served as the city attorney for the City of Phoenix. He served as the city attorney for a small community outside *436 Phoenix. He worked with real estate financing and mortgage banking, having obtained licenses from the State of Arizona to sell and broker real estate. He served as a State representative in the Arizona House of Representatives. In 1991, Mr. Kenney was arrested by Arizona law enforcement officers for taking bribes as a State representative. He was caught by an undercover sting operation known as "AZSCAM", details of which first appeared in local Phoenix newspapers on or about February 6, 1991. Later in that year, he was convicted of the following felonies stemming from that arrest: (1) Conspiracy to illegally conduct an enterprise; (2) bribery of a public servant; (3) money laundering in the second degree; (4) participation in a criminal syndicate; and (5) conspiracy to commit theft by extortion. b. Mrs. Kenney
Mrs. Kenney graduated from high school in 1966, and she married Mr. Kenney in 1976. During the 10 years prior to their marriage, Mrs. Kenney worked outside the home. For each of these years, Mrs. Kenney filed a Federal income tax return. She knew then, and has continued to know since, of her duty to file Federal income tax returns. During the subject years, Mrs. Kenney *437 had her own credit cards from most of the major department stores, including Saks Fifth Avenue and Nordstrom. [3] Mr. Kenney gave Mrs. Kenney broad discretion with respect to these cards, including the payment of the related bills, and he did not review the monthly bills before she paid them. Mrs. Kenney used these cards to purchase clothes, shoes, jewelry, and makeup totaling at least $ 6,562 in 1989 and at least $ 1,284 in 1990. [4] Mrs. Kenney typically paid for her charges by writing checks from: (1) Petitioners' joint account at the Valley National Bank (Valley Personal Account), (2) Corporation's business account at Chase Bank (Chase Business Account), and (3) Corporation's business account at Valley National Bank (Valley Business Account). *438 Mrs. Kenney monitored and paid all of petitioners' household bills during the subject years. c. Petitioners' Residence and Summer Vacations
During the subject years, petitioners resided in a house at 16 Moon Mountain Trail (Moon Mountain Residence), into which they had moved in 1983. [5] The Moon Mountain Residence was a large house, approximately 4,600 square feet, that was situated at the top of a mountain in an upper class neighborhood with houses ranging in value from $ 500,000 to $ 1 million. The living area of the Moon Mountain Residence was 100 percent glass, allowing for a panoramic view of the surrounding valley. The master bedroom had a domed ceiling and a fireplace. Improvements to the outside grounds included a swimming pool, gazebo, gas fireplace, and fountains. During the subject years, the Moon Mountain Residence was encumbered by a first and second mortgage that *439 required monthly payments totaling approximately $ 2,035. Mrs. Kenney knew about these mortgages, and she knew about the payments. Petitioners generally paid the mortgages with funds from their personal "property account" at Valley Bank (Valley Property Account). Petitioners had joint signature authority over this account, as well as a second property account at the Chase Bank (Chase Property Account). [6]
*440 During 1989, Mrs. Kenney wrote and signed at least $ 7,386 in checks on the Valley Property Account to renovate the Moon Mountain residence. During 1989 and 1990, she wrote and signed checks on the Chase Property Account totaling at least $ 29,797 and $ 299, respectively, to renovate the Moon Mountain Residence. During every year starting in the mid-1980s, petitioners rented for a month a two-bedroom apartment in southern California and vacationed there. d. Petitioners' Current Status
Petitioners are in the midst of a divorce proceeding. Their marital estate is worth approximately $ 1 million, without regard to the below-mentioned $ 215,000 that Mrs. Kenney took from Mr. Kenney's apartment. Mrs. Kenney seeks from the marital estate a $ 400,000 cash payment, in addition to the right to keep the $ 215,000 mentioned below, in lieu of specific marital assets. Petitioners recently sold the Moon Mountain Residence for nearly $ 900,000. Their equity from the sale was approximately $ 350,000. Petitioners each received $ 50,000 of this equity, and the balance is included in their marital estate. Some proceeds from the sale were used to pay miscellaneous bills of a community nature. *441 e. Cash and Credit Cards Taken by Mrs. Kenney
On March 19, 1994, Mrs. Kenney entered Mr. Kenney's apartment without his consent and took: (1) $ 200,000 in cashier's checks payable to him; [7] (2) a key to a vault, from which she later took $ 15,000; and (3) credit cards bearing only Mr. Kenney's name and for which she was not an authorized signatory. Mrs. Kenney deposited the checks into petitioners' joint account, and she then withdrew the corresponding cash and bought cashier's checks in her name. Mrs. Kenney used at least $ 34,000 of the $ 215,000 to purchase a 1994 Ford Explorer Limited Edition for herself. With respect to the balance of these funds, as well as the $ 50,000 that she received from the sale of the Moon Mountain Residence, Mrs. Kenney had none of these funds left on February 23, 1995, the date of the trial on the innocent spouse issue. Mrs. Kenney used the credit cards that she took from Mr. Kenney's apartment to charge at least $ 10,000 *442 worth of goods for her personal use. 2. Petitioners' Tax Returns
After their marriage, Mrs. Kenney had Mr. Kenney prepare and file their tax returns. Petitioners filed a 1989 and a 1990 Form 1040, U.S. Individual Income Tax Return, on August 21, 1990, and August 8, 1991, respectively. They filed both returns using the status of "Married filing joint return". Mr. Kenney signed both returns for himself, and he signed both returns for Mrs. Kenney pursuant to her authorization. Although Mrs. Kenney knew that Mr. Kenney was filing these returns on their behalf, she never asked him to let her see either return or its contents. Petitioners' 1989 and 1990 Forms 1040 reported the following gross income from wages, interest, and dividends; adjusted gross income; taxable income; and tax liability: Wages,
Adjusted
Interest,
Gross
Taxable
Tax
Year
Dividends
Income
Income
Liability
1986
$ 41,265
$ 29,822
-0-
-0-
1987
66,843
8,980
-0-
-0-
1988
69,044
42,763
-0-
-0-
1989
186,892
25,794
-0-
-0-
1990
128,471
31,258
-0-
-0-
Neither the 1989 nor 1990 Form 1040 reported income from the Plans. The 1990 Form 1040 did not report income connected to *443 AZSCAM. The 1989 and 1990 Forms 1040 reported $ 18,000 of income from Corporation. When petitioners filed their 1989 and 1990 tax returns, Mr. Kenney knew that the records he used to prepare the returns were sloppy and full of mistakes, and that he had commingled funds. He also knew that he acted in his capacity as the Plans' trustee "sloppier and looser" than he should have. 3. Corporation's Real Estate Activities
Mr. Kenney invested heavily and extensively in the real estate market in and around Phoenix, Arizona. Many of his investments were structured through (1) limited partnerships, for which he was the general partner, or (2) his wholly owned corporations. Mr. Kenney formed Corporation in 1970 to practice law and to acquire, manage, and sell investments that were primarily real estate. He has been Corporation's only shareholder and its director and president. For the subject years, Corporation managed no fewer than 13 entities (Entities) and their properties. Most of the Entities were Arizona limited partnerships, for which Mr. Kenney served as a general partner and sometimes a limited partner. Corporation's primary business purpose was managing the Entities and their *444 properties in return for management fees. 4. The Plans and Their Relevant Terms
a. Overview
Corporation formed the Plans in the early 1970s. Mr. Kenney has been the Plans' only participant. b. The PSP
The PSP's governing documents in effect on January 1, 1989 and 1990 (collectively referred to as the PSP's Governing Documents), set forth the following rules that must be met for Corporation's employees to be eligible to participate in the PSP: Any Eligible Employee who has completed one (1) Year of Service and has attained age 21 shall be eligible to participate hereunder as of the date he has satisfied such requirements. * * * * An Eligible Employee [defined in the PSP's Governing Documents as any employee] shall become a Participant effective as of the first day of the month coinciding with or next following the date on which such Employee met the eligibility requirements of Section 3.1, provided said Employee was still employed as of such date (or if not employed on such date, as of the date of rehire if a 1-Year Break in Service has not occurred).
According to the PSP's Governing Documents: "Year of Service" means the computation period of twelve *445 (12) consecutive months, herein set forth, during which an Employee has at least 1000 Hours of Service. For purposes of eligibility for participation, the initial computation periods shall begin with the date on which the Employee first performs an Hour of Service. The participation computation period beginning after a 1-Year Break in Service shall be measured from the date on which an Employee again performs an Hour of Service.
With respect to loans to participants, the PSP's Governing Documents state that: (1) Loans must bear a reasonable rate of interest; (2) loans must be adequately secured; (3) loans must provide for repayment over a reasonable period of time; (4) loans must not provide for repayment beyond the participant's normal retirement date; (5) each participant's loan balance may not exceed $ 50,000; (6) loans must provide for level amortization periods not less than quarterly and over a period not to exceed 5 years; (7) a participant's spouse must give written consent to any loan that is secured by the participant's vested interest in the plan; and (8) loans after December 31, 1988, must be pursuant to a written "Participant loan program". With regard to distributions *446 to participants, the PSP's Governing Documents set forth the following distributable events: (1) Death; (2) normal retirement at age 59-1/2; (3) disability; (4) preretirement at age 55; (5) termination; or (6) hardship. c. The MPP
The MPP's governing document in effect on January 1, 1989 (the MPP's Governing Document), sets forth the following requirements for Corporation's employees to be eligible to participate in the MPP: Any Eligible Employee [defined in the MPP's Governing Document as any employee] who has completed two (2) Years of Service and has attained age 21 shall be eligible to participate hereunder as of the date he has satisfied such requirements. * * * * An Eligible Employee shall become a Participant effective as of the first day of the Plan Year in which such Employee met the eligibility requirements of Section 3.1 if such eligibility requirements were met during the first six months of that Plan Year, or, if such Employee met the eligibility requirements of Section 3.1 during the last six months of a Plan Year, then the Employee shall become a Participant effective as of the first day of the next succeeding Plan Year if still employed or the date of *447 rehire if a 1-Year Break in Service has not occurred.
According to the MPP Governing Document: "Year of Service" means the computation period of twelve (12) consecutive months, herein set forth, during which an Employee has at least 1000 Hours of Service. For purposes of eligibility for participation, the computation periods shall be measured from the date on which the Employee first performs an Hour of Service and anniversaries thereof. The participation computation periods beginning after a 1-Year Break in Service shall be measured from the date on which an Employee again performs an Hour of Service and anniversaries thereof. * * * * " Former Participant" means a person who has been a Participant, but who has ceased to be a Participant for any reason. * * * * "Participant" means any Eligible Employee who participates in the Plan as provided in Sections 3.2 and 3.3, and has not for any reason become ineligible to participate further in the Plan. * * * * If any Former Participant is reemployed after a 1-Year Break in Service has occurred, Years of Service shall include Years of Service prior to his 1-Year Break in Service subject to the following rules: *448 (i) If a Former Participant has a 1-Year Break in Service, his pre-break and post- break service shall be used for computing Years of Service for eligibility and for vesting purposes only after he has been employed for one (1) Year of Service following the date of his reemployment with the Employer.
With respect to loans to participants and distributable events, the relevant provisions of the MPP's Governing Document are identical to the corresponding provisions in the PSP's Governing Documents. 5. Certain Workers of Corporation
a. Kevin Peterson
Kevin Peterson (Peterson) started working for Corporation in 1985, when he was 20 years old, and he generally worked 30 to 40 hours per week on a continuous and uninterrupted basis until 1991. Before working for Corporation, Peterson did not have any related work experience, and he did not have a college degree. Peterson was an essential part of Corporation's business, and he oversaw its daily operation. Peterson was Mr. Kenney's chief assistant, and he was the immediate supervisor of Corporation's clerical help. In his supervisory capacity, Peterson oversaw Corporation's clerical workers and interviewed applicants for *449 clerical openings. As Corporation's "property manager", Peterson managed the Entities. He hired and fired on- site managers, negotiated leases, ensured that property taxes were paid timely, prepared annual reports for presentation to limited partners, researched and investigated property acquisition opportunities, researched and investigated the possibility of subdividing raw land, briefed Mr. Kenney on current events in the real estate markets next to the situs of the Entities, signed checks drawn on Corporation's accounts, and was allowed to sign checks payable from the Entities' accounts. Peterson also completed, signed, and filed Corporation's workmen's compensation fund annual reports with the State of Arizona, [8] and, at the direction of Mr. Kenney, signed Corporation's 1989 and 1990 Annual Reports and Certificates of Disclosure as its officer and director. [9]
*450 Peterson reported directly to Mr. Kenney, and they conferred and consulted regularly regarding Corporation's business. Peterson had to obtain Mr. Kenney's approval for expenses greater than $ 500; Mr. Kenney required Peterson to report to him weekly on Peterson's duties with Corporation; and Mr. Kenney required that Peterson consult with him if an emergency arose with respect to the Entities. Mr. Kenney was the final arbiter with respect to all business decisions that Peterson made in the course of his work with Corporation. Mr. Kenney required that Peterson inform him when he (Peterson) would not be at work. Mr. Kenney permitted Peterson to engage in work outside Corporation's management activities only to the extent it did not interfere with his responsibility to Corporation. Peterson had to document his time and submit this documentation to Corporation. Corporation paid him biweekly based on a set hourly rate times the number of documented hours. Mr. Kenney paid Peterson by writing him a check from each of the Entities, rather than one check from Corporation. [10] The paychecks that Corporation gave Peterson during 1987 through 1989 stated that the checks represented "wages" or *451 "salary". When Mr. Kenney hired Peterson to work for Corporation, Mr. Kenney told Peterson that he would be an independent contractor for tax purposes. Mr. Kenney wanted Peterson to be an independent contractor because Mr. Kenney: (1) Did not want to pay employment taxes on Peterson and (2) did not want to include him in the Plans. During Peterson's tenure with Corporation, it reimbursed him for the employer portion of the Social Security tax. It paid him vacation pay, sick pay, and a Christmas bonus. It gave him employee type health benefits. It reimbursed him for his business mileage. It reimbursed him for a real estate course that he took. Mr. Kenney gave him a rent-free apartment. Peterson filed a 1988 and a 1989 Schedule C, Profit or Loss from Business, that: (1) Described his business as "realtor property management" and (2) listed Corporation's address as his business address. These Schedules C reported all the *452 income that Peterson earned from Corporation as gross receipts and did not report any other income. These Schedules C did not report any depreciation, other than for Peterson's automobile. b. Delia H. McDonald
Delia H. McDonald (McDonald) started working for Corporation in April 1985 when she was 34 years old, and she generally worked 30 hours per week on a continuous and uninterrupted basis until February 1987. She restarted working for Corporation in March 1988, and she generally worked 35 to 40 hours per week on a continuous and uninterrupted basis until May 1990. During each of these tenures, Mr. Kenney set McDonald's working hours at 9 a.m. to 3 p.m. McDonald's job title, description, and duties did not materially change from her first tenure with Corporation to her second. McDonald was Corporation's "general office secretary". She answered the phone, made copies, typed, sorted mail, wrote business checks for the Entities and Corporation, wrote Corporation's paychecks and kept its payroll books, and monitored Corporation's accounts receivable and payable systems. McDonald also supervised a part-time assistant who helped McDonald with her job. Mr. Kenney trained McDonald *453 for her duties, and he usually spoke with her daily. He was her ultimate boss, and he controlled her job-related activities. Mr. Kenney could terminate McDonald, with or without cause, at any time. During each of her tenures, Mr. Kenney treated McDonald as an independent contractor for tax purposes because he did not want to pay employment taxes on her. Mr. Kenney required her to keep track of her hours. Corporation paid her an hourly rate on a biweekly basis, vacation pay, and a holiday bonus. [11] Corporation gave McDonald one paycheck drawable on its business account. The paychecks that she received during 1987 through 1989 stated that the checks represented "wages". McDonald did not file a Schedule C for any period that she was with Corporation. McDonald considered herself an "employee" of Corporation. The only reason McDonald agreed to be treated as an independent contractor for tax purposes was because Mr. Kenney required it as a condition *454 of her employment. 6. Workmen's Compensation and Employment Tax Forms
From 1987 through 1990, Corporation had a workmen's compensation policy. Corporation paid the policy's premiums for each year. The policy covered Peterson and McDonald. Corporation filed quarterly unemployment tax forms with the State of Arizona for 1987 through 1990 and the first quarter of 1991. On each of these forms, Mr. Kenney listed McDonald and Peterson as employees of Corporation. Mr. Kenney signed these forms in his capacity as Corporation's president. 7. Fair Market Value on December 31, 1989, of the Plans' Assets
On December 31, 1989, the assets and fair market value of the PSP were as follows: Chase Bank
$ 8,745
Prudential Bache
242,702
251,447
The assets and fair market value of the MPP was as follows: Southwest Savings
$ 126,607
Chase Bank
11,792
Prudential Bache
110,705
Partnership interest
195,203
444,307
Mr. Kenney had no adjusted tax basis in any of these assets on this date. 8. Distributions From the Plans During 1989 and 1990
a. Overview
Petitioners received the following unreported distributions from the PSP during 1989 and 1990: PSP's Accounts
1989
1990
Chase Bank
$ 332,089
$ 95,297
Prudential Bache
165,398
--  Southwest Savings
488,713
--  986,200
95,297
*455 Petitioners received the following unreported distributions from the MPP during 1989 and 1990: MPP's Accounts
1989
1990
Chase Bank
$ 266,159
$ 40,047
Prudential Bache
17,119
--  Southwest Savings
278,059
--  561,337
40,047
During the subject years, a distribution did not occur under the Plans' terms. The Plans did not have a "participant loan program", as required by the Plans' Governing Documents, and none of the distributions made to Mr. Kenney or to any of his related entities were accompanied by documents stating that: (1) The loans would be repaid within 5 years; (2) the repayment period would not extend beyond Mr. Kenney's normal retirement date; (3) a reasonable interest rate applied; (4) a level amortization period of not less than quarterly applied; (5) Mrs. Kenney consented to the loan; or (6) Mr. Kenney opted out of the joint and survivor annuity provisions of the Plans. During the subject years, Mr. Kenney routinely had Peterson go to the bank and purchase cashier's checks with checks drawn on the Plans' accounts. Mr. Kenney used these checks to acquire personal real estate holdings. b. Specific Distributions in 1989
During 1989, Mr. Kenney *456 wrote and cashed numerous checks payable to himself from the PSP's Chase and Southwest Savings accounts. None of these checks were used to purchase assets for the PSP. Mr. Kenney used at least some of these checks for personal purposes including acquiring and maintaining his personal real estate holdings. Mr. Kenney did likewise with respect to other checks drawn on the PSP's Prudential Bache account. During 1989, Mr. Kenney wrote and cashed checks payable to himself from the MPP's Chase and Southwest Savings accounts. He did not use any of these checks to acquire assets for the MPP. He used some of these checks for personal purposes including acquiring and maintaining his personal real estate holdings. He did likewise with respect to checks from the MPP's Prudential Bache account. c. Specific Distributions in 1990
During 1990, Mr. Kenney used checks drawn on the PSP's Chase account to acquire or maintain his personal real estate holdings. He also used at least one other check drawn on this account for personal purposes. During 1990, Mr. Kenney wrote and cashed checks payable to himself from the MPP's Chase account. He used at least some of these checks to acquire or maintain *457 his personal real estate holdings. 9. Deposits Into the Plans During 1989 and 1990
a. 1989
The following amounts were deposited into the Plans in 1989: Account
Amount
Chase Bank
$ 107,928
Southwest Savings
238,636
Chase Bank
30,423
Southwest Savings
225,282
602,269
The deposits were in the form of checks made payable either to Mr. Kenney or to a related entity. None of the deposits represent receipts from assets of the Plans or repayments of bona fide debts by Mr. Kenney or any related entity. b. 1990
The following amounts were deposited into the Plans in 1990: Account
Amount
Chase Bank
$ 92,402
Chase Bank
44,658
Prudential Bache
316,000
453,060
These deposits were in the form of checks made payable to Mr. Kenney or to a related entity. None of these deposits represent receipts from assets of the Plans or repayments of bona fide debts from Mr. Kenney or a related entity. 10. Joint Bank Accounts
a. Chase Business Account and Valley Business Account
During 1989, Mr. Kenney wrote $ 34,300 in checks to himself payable from the PSP's Chase account and deposited these checks into the Chase Business Account. He also wrote checks *458 for $ 21,000 to himself payable from the PSP's Southwest Savings account and deposited these checks into the Valley Business Account. During 1989, Mr. Kenney wrote at least $ 12,000 in checks to himself payable from the MPP's Southwest Savings account and deposited these checks into the Valley Business Account. He also wrote a $ 5,000 check to himself, payable from the MPP's Chase account, and deposited this check into the Chase Business Account. During the subject years, petitioners had joint signature authority over the Chase Business Account and the Valley Business Account. Mrs. Kenney wrote and signed at least $ 10,038 and $ 14,496 in checks during 1989 and 1990, respectively, from the Chase Business Account. During 1989, she wrote and signed at least $ 8,252 in checks from the Valley Business Account. Mrs. Kenney used many (if not all) of these checks to pay personal and household expenses. During the subject years, Mrs. Kenney received a $ 750 check approximately every 2 weeks payable to her from the Chase Business Account. Mr. Kenney also received checks payable to him from this account. During the subject years, Mrs. Kenney received at least $ 10,730 and $ 4,376, respectively, *459 in checks from the Chase Business Account that she deposited into the Valley Personal Account. During 1989, Mr. Kenney wrote and signed at least $ 12,358 in checks from the Chase Business Account. Mr. Kenney also wrote checks from the Chase Business Account during 1990. Many of these checks paid petitioners' personal expenses. b. Chase Property Account and Valley Property Bank Account
During 1989, Mr. Kenney wrote $ 30,300 in checks to himself payable from the PSP's Chase account and deposited these checks into the Chase Property Account. He also wrote $ 17,000 in checks to himself payable from the PSP's Southwest Savings account and deposited these checks into the Valley Property Account. During 1989, Mr. Kenney wrote $ 11,000 in checks to himself payable from the MPP's Southwest Savings account and deposited these checks into the Valley Property Account. He also wrote a $ 3,000 check to himself payable from the MPP's Chase account and deposited it into the Chase Property Account. During 1990, Mr. Kenney wrote $ 2,750 in checks to himself payable from the MPP's Chase account and deposited these checks into the Chase Property Account. c. Valley Personal Account
During *460 1989 and 1990, Mrs. Kenney routinely deposited her $ 750 checks from the Chase Business Account into the Valley Personal Account. During 1989 and 1990, petitioners had signature authority over this account. Mrs. Kenney maintained the account. During 1989 and 1990, she drew at least $ 17,283 and $ 15,382, respectively, from this account for personal reasons. This account's bank statements were mailed to petitioners' personal residence. d. Another Personal Account
During 1989, Mr. Kenney wrote a $ 1,000 check to himself payable from the MPP's Southwest Savings account and deposited it into a second joint account of petitioners' at Valley Bank. Petitioners had joint signature authority over this account. 11. Other Purchases
During 1989, Mr. Kenney wrote $ 350,788 in checks on the Plans' accounts to purchase various pieces of unimproved real estate in Arizona held by him or a related entity. Most (if not all) of the land is community property that is included in petitioners' marital estate. During 1989, Mr. Kenney used PSP funds to pay off $ 128,960 in community debts to Southwest Savings. 12. An Entity Account
During 1989, Mr. Kenney wrote a $ 5,000 check on the *461 PSP's Chase account payable to one of the Entities (Coronado Apartments), and he deposited the check into that entity's bank account at Valley Bank (Coronado Account). He wrote $ 9,100 in checks on the PSP's Southwest Savings account payable to the Coronado Apartments and deposited these checks into the Coronado Account. He wrote a $ 4,000 check on the MPP's Southwest Savings account payable to Coronado Apartments and deposited it into the Coronado Account. During 1990, Mr. Kenney wrote $ 9,250 in checks on the PSP's Chase account payable to the Coronado Apartments and deposited these checks into the Coronado Account. He also wrote $ 3,300 in checks from the MPP's Chase account payable to the Coronado Apartments and deposited these checks into the Coronado Account. Mrs. Kenney had signature authority over the Coronado Account during 1989 and 1990. 13. Another Entity Account
During 1989, Mr. Kenney wrote a $ 9,000 check on the PSP's Southwest Savings account payable to another of the Entities (40th Street Apartments) and deposited it into that entity's account at Valley Bank (40th Street Account). Mr. Kenney also wrote a $ 9,000 check on the MPP's Southwest Savings account *462 payable to 40th Street Apartments and deposited it into the 40th Street Account. Mrs. Kenney had signature authority over the 40th Street Account during 1989 and 1990. OPINION 1. Coverage Requirements
Respondent determined that the Plans failed to satisfy the qualification and coverage requirements of section 401(a)(1) and (3), respectively, effective with their plan years ended December 31, 1989. Respondent alleges that the Plans were disqualified in that year because they did not benefit enough of Corporation's non-"highly compensated employees". See secs. 401(a)(3), (4), (26), 410(b). Whether the Plans benefited enough non-highly compensated employees rests on whether Peterson and McDonald were Corporation's employees. Because respondent determined that they were, petitioners must prove that they were not. Welch v. Helvering, 290 U.S. 111, 115 (1933). Whether an employee-employer relationship exists in a given situation is a factual question to which common law principles apply. Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 323 (1992); Weber v. Commissioner, 103 T.C. 378, 386 (1994), *463 affd. 60 F.3d 1104 (4th Cir. 1995); Professional & Executive Leasing, Inc. v. Commissioner, 89 T.C. 225, 232 (1987), affd. 862 F.2d 751 (9th Cir. 1988). Factors that are relevant in determining the substance of an employment relationship include: (1) The degree of control exercised by the principal over the details of the work; (2) the taxpayer's investment in the facilities used in his or her work; (3) the taxpayer's opportunity for profit or loss; (4) the permanency of the relationship between the parties; (5) the principal's right of discharge; (6) whether the work performed is an integral part of the principal's regular business; (7) the relationship the parties believe they are creating; and (8) the provision of employee benefits. NLRB v. United Ins. Co., 390 U.S. 254, 258 (1968); United States v. Silk, 331 U.S. 704, 716 (1947); Weber v. Commissioner, supra at 387; Professional & Executive Leasing, Inc. v. Commissioner, supra at 232; see also sec. 31.3121(d)-(1)(c)(2), *464 Employment Tax Regs. (setting forth criteria for identifying employees under the common law rules). No single factor is dispositive; the Court must assess and weigh all incidents of the relationship. Nationwide Mut. Ins. Co. v. Darden, supra at 324. The factors are not weighed equally; they are weighed according to their significance in the particular case. Aymes v. Bonelli, 980 F.2d 857, 861 (2d Cir. 1992). We turn to the eight factors mentioned above as they relate to the facts at hand. i. Degree of Control
The purported employer's degree of control over the details of a taxpayer's work is the primary factor for determining a common law employment relationship. Chin v. United States, 57 F.3d 722 (9th Cir. 1995); Weber v. Commissioner, supra at 387-388; Professional & Executive Leasing, Inc v. Commissioner, supra at 232-233. According to general common law principles, an employment relationship is present when the person for whom the services are performed has the right to control the manner and means by which *465 the result is to be accomplished. Nationwide Mut. Ins. Co. v. Darden, supra at 323; see also sec. 31.3401(c)-1(b), Employment Tax Regs. A lesser degree of control exercised by a principal may constitute an employment relationship where the inherent nature of the job mandates an independent approach. See, e.g., Potter v. Commissioner, T.C. Memo. 1994-356; Bilenas v. Commissioner, T.C. Memo. 1983-661. Based on our careful review of the instant record, we find that Corporation, through Mr. Kenney, had the right to control Peterson and McDonald. Mr. Kenney had the right to tell them what to do, when to do it, where to do it, and how to do it. Mr. Kenney had the right to control the details of their work. McGuire v. United States, 349 F.2d 644, 646 (9th Cir. 1965); Thomas Kiddie, M.D., Inc. v. Commissioner, 69 T.C. 1055, 1058 (1978). He was their boss. He trained, directed, and supervised them. He controlled their work-related activities. He required them to report to him regularly with respect to their corporate duties. He mandated *466 to them that he was the final arbiter on any work-related disputes. He required them to obtain his approval of their leave for vacation. This factor supports respondent's determination. ii. Investment in Facilities
Neither Peterson nor McDonald invested in their work facilities. They generally worked for Corporation on its premises. Corporation provided them each with office space and a desk at which to complete their work. Corporation reimbursed Peterson for the expense of his vehicle. This factor supports respondent's determination. iii. Opportunity for Profit or Loss
Neither Peterson's nor McDonald's pay was computed in such a manner that they could realize a profit or loss from their job. As long as they put in the hours, they would receive their paycheck just like any other employee. Neither Peterson nor McDonald engaged in any income-producing activity, aside from their work for Corporation, and Mr. Kenney would not have allowed them to do so to the extent that it interfered with Corporation's business. We also find relevant the fact that Corporation paid Peterson and McDonald by the hour. Payment of compensation by the hour is consistent with an employment relationship. *467 See, e.g., Potter v. Commissioner, supra; Laraway v. Commissioner, T.C. Memo. 1992-705. This factor supports respondent's determination. iv. Permanency of Relationship
Peterson's employment with Corporation was continuous and uninterrupted for approximately 7 years. McDonald's employment was continuous and uninterrupted during each of her tenures, and spanned over 6 years. This factor supports respondent's determination. v. Right of Discharge
Nothing in the record indicates that Corporation could not terminate Peterson or McDonald at will. This factor supports respondent's determination. vi. Integral Part of Business
Peterson and McDonald were an integral part of Corporation's business. They were essential to Corporation's operation. Among other things, the integration of Peterson and McDonald into Corporation's business is further evidenced by the facts that: (1) Peterson managed its clients, i.e., the Entities, and could sign checks for both Corporation and the Entities, and (2) McDonald monitored Corporation's payroll, payables, and receivables. This factor supports respondent's determination. *468 vii. Relationship Believed Created by Parties
We have no doubt that Mr. Kenney wanted Peterson and McDonald to be independent contractors. What he wanted them to be, however, is inconsistent with both the substance of the employment relationship and what the parties actually knew the relationship to be. Mr. Kenney knew that Peterson and McDonald were employees, but he called them independent contractors because he did not want to pay employment taxes on them or include them in the Plans. In addition to the fact that Mr. Kenney represented to the public that Peterson was Corporation's employee, Corporation's workmen's compensation policy covered both Peterson and McDonald. [12] Corporation also filed State employment tax forms listing Peterson and McDonald as employees, reimbursed Peterson for the "employer portion" of Social Security, and noted on paychecks to Peterson and McDonald that the payments were for "wages" or "salary". Although Peterson treated himself for tax purposes as an independent contractor, he did so only because Mr. Kenney told him to do so. *469 This factor supports respondent's determination. viii. Provision of Employee Benefits
Corporation paid Peterson a full package of employee benefits, including vacation pay, sick pay, health insurance, holiday bonuses, rent-free apartment, payment of employment taxes, reimbursement of business mileage, and payment of his real estate course. Corporation paid McDonald vacation pay and holiday bonuses. This factor supports respondent's determination. ix. Conclusion
Based on our careful review of the entire record, and in connection with our analysis of the eight factors above, we conclude that Peterson and McDonald were employees of Corporation during the years relevant herein. Having so concluded, we now address whether they were eligible to participate in the Plans as of January 1, 1989. The Plans Governing Documents set forth that any employee may participate therein if he or she is over 21 years of age and has completed 1 year of service. A year of service is 12 consecutive months in which the employee has worked at least 1000 hours. Given the fact that Peterson was over 21 years of age as of December 1, 1989, and had worked for Corporation for more than 1000 hours *470 a year from 1986 to 1989, we conclude that Peterson was eligible to participate in the Plans in 1989. We also conclude that McDonald was eligible to participate in the PSP as of December 1, 1989. She was over the age of 21 and had worked at Corporation for the period of March 1988 to May 1990 for over 1000 hours per year. Regarding the MPP, the analysis is slightly more complex, due to McDonald's break in service. The MPP computes eligibility based on actual hours, not elapsed time. See sec. 1.410(a)-7, Income Tax Regs. McDonald worked over 1000 hours from April 1985 to April 1986, and 1000 hours from April 1986 to April 1987. Because the MPP determines eligibility based on actual hours, McDonald met the service requirements prior to her break in service in February 1987. Once she was reemployed in March 1988, and completed another year of service, she was credited with her previous years of service and treated as a participant no later than the date of her rehire. Sec. 410(a)(5); sec. 1.410(a)-7(c)(3)(B), Income Tax Regs.
In testing the Plans for compliance with sections 401(a)(26) and 410(b), McDonald may be excluded from consideration only if she did not meet the age and service *471 requirements for plan participation, as of the years in issue. Sec. 410(b)(4). [13] Because McDonald met the age and service requirements, she may not be excluded from consideration in applying these tests. Given the fact that the Plans did not cover Peterson and McDonald, the Plans were disqualified for failing to meet the coverage requirements, and petitioners must include in their 1989 income the total vested accrued benefit. Sec. 402(b)(4). Because Mr. Kenney was the only participant in the Plans, his vested accrued benefit equals the value of the Plans' assets on December 31, 1989, i.e., the end of the plan year. [14] Sec. 411(a)(7)(A). *472 2. Distributions From the Plans
During the 1989 taxable year, Mr. Kenney wrote to himself numerous checks from accounts of the Plans. Petitioners contend that these disbursements to Mr. Kenney were loans. Respondent maintains that they were not. We agree with respondent that none of the amounts that Mr. Kenney withdrew from the Plans were loans to him. Petitioners have failed to convince us to the contrary. Indeed, the record clearly supports respondent's determination. Among other things, it clearly shows that Mr. Kenney withdrew these funds to acquire personal real estate holdings. As none of the disbursements were loans to him, the distributions are taxable distributions to petitioners in the year of receipt, with no exclusion ratio applicable, as Mr. Kenney had no basis in the disbursements. Sec. 72. During the years in issue, Mr. Kenney also wrote numerous checks from the accounts of the Plans made payable to the names of his related entities, as well as some other miscellaneous unidentified checks. Virtually all of the disbursements were deposited into bank accounts over which Mr. Kenney had signature authority. The disbursements were, in substance, disbursements to *473 Mr. Kenney. Mr. Kenney had dominion and control over the funds, and unfettered access to the funds disbursed from the Plans and deposited into the accounts of the various entities, and he used the funds personally. Much of the money was used to satisfy obligations Mr. Kenney had with respect to the various partnerships. [15] The disbursements to Mr. Kenney are taxable to petitioners. Secs. 72(p)(1), 61(a). 3. Moneys Received by Petitioners From Other Than the Plans
During the subject years, Mr. Kenney deposited over $ 1 million in unreported taxable funds into the Plans' accounts. Virtually all of the checks were made payable to him, or to his related entities. Of the few checks that were made payable to Mr. Kenney as trustee, there is no evidence that such checks represented repayments of bona fide debts owed the Plans, or that the checks represented income earned on *474 the Plans' assets. Indeed, almost none of the entities that put money into the Plans' accounts are the same entities that supposedly were lent money by the Plans. Mr. Kenney, as general partner of 40th Street and the other partnerships, was entitled to distributions from those partnerships. The moneys that he received from the various entities and deposited into the Plans' accounts are taxable to him. Sec. 61. 4. Accuracy-Related Penalty Under Section 6662(a) and (b)(1)
Respondent determined that petitioners' underpayments of income tax for 1989 and 1990 were due to negligence, and, accordingly, that they are liable for penalties under section 6662(a) and (b)(1). Section 6662(a) and (b)(1) imposes an accuracy-related penalty equal to 20 percent of the portion of an underpayment that is attributable to negligence. Petitioners must prove respondent's determination wrong. Rule 142(a); Welch v. Helvering, 290 U.S. at 115. They must prove that they were not negligent; i.e., that they made a reasonable attempt to comply with the provisions of the Internal Revenue Code, and that they were not careless, reckless, or in intentional disregard of rules *475 or regulations.[16] Sec. 6662(c). Petitioners' education and business experience are two factors that we consider to determine whether they were negligent in the preparation of the subject returns. Sutor v. Commissioner, 17 T.C. 64, 68-69 (1951). Mr. Kenney is an educated and sophisticated businessman, lawyer, and politician. He also has an extensive tax background, including work experience with the Internal Revenue Service and a master's in taxation. Given the additional fact that Mr. Kenney acknowledge that he commingled funds and kept sloppy books, we conclude that petitioners did not make a reasonable attempt to comply with the provisions of the Internal Revenue Code. We sustain respondent's *476 determination with respect to these penalties. 5. Innocent Spouse
Spouses-generally are jointly and severally liable for income taxes due on a joint Federal income tax return. Sec. 6013(d)(3); Guth v. Commissioner, 897 F.2d 441, 442 (9th Cir. 1990), affg. T.C. Memo. 1987-522. The "innocent spouse" provision of section 6013(e) relieves a spouse of joint Federal income tax liability if the following four elements are met: (1) A joint Federal income tax return was filed by the spouses; (2) there is a substantial understatement of tax attributable to grossly erroneous items of the other spouse; (3) in signing the return, the claimed innocent spouse did not know, and had no reason to know, of the substantial understatement; and (4) taking into account all the facts and circumstances, it would be inequitable to hold the claimed innocent spouse liable for the deficiency attributable to the understatement. Sec. 6013(e)(1). The claimer of innocent spouse relief, in this case Mrs. Kenney, must prove that each of these elements is satisfied. Rule 142(a); Welch v. Helvering, supra at 115; Bokum v. Commissioner, 94 T.C. 126, 138-139 (1990), *477 affd. 992 F.2d 1132 (11th Cir. 1993). Following the parties' stipulations, Mrs. Kenney will be an "innocent spouse" if she proves that: (1) She lacked actual and constructive knowledge of the understatements, and (2) it would be inequitable to hold her liable for the deficiencies. Her failure to prove either of these prongs will preclude innocent spouse relief. [17]Bokum v. Commissioner, supra; see also Stevens v. Commissioner, 872 F.2d 1499, 1504 (11th Cir. 1989), affg. T.C. Memo. 1988-63. *478 We conclude that Mrs. Kenney did not have actual knowledge that either the 1989 or 1990 Form 1040 contained a substantial understatement of tax attributable to grossly erroneous items of Mr. Kenney. Mrs. Kenney did not review or sign either of these returns before they were filed. With respect to the issue of constructive knowledge, we apply the law of the circuit to which an appeal of this case lies; i.e., the Court of Appeals for the Ninth Circuit. Sec. 7482(b)(1); Golsen v. Commissioner, 54 T.C. 742 (1970), affd. on another issue 445 F.2d 985 (10th Cir. 1971). In the Ninth Circuit, a taxpayer constructively knows about an understatement if, upon signing his or her tax return, a similarly situated, reasonably prudent taxpayer could be expected to know that the return contained a substantial understatement. Key factors to consider in making this determination include: (1) The claimed innocent spouse's level of education; (2) his or her involvement in the family's business and financial affairs; (3) the presence of unusual or lavish expenditures; and (4) the culpable spouse's evasiveness and deceit concerning the family's *479 finances. Price v. Commissioner, 887 F.2d 959, 965 (9th Cir. 1989), revg. an Oral Opinion of this Court; see also Pietromonaco v. Commissioner, 3 F.3d 1342, 1345 (9th Cir. 1993), revg. T.C. Memo. 1991-361. The record establishes that Mrs. Kenney had constructive knowledge of the understatements in both years. Although she was extensively involved in the family finances, she took no steps to assure herself that petitioners' tax returns were filed properly. She did not ask (or even care) to see the returns. She was not concerned with, and turned a blind eye to, her tax obligations. Bearing in mind that she also lived an upperclass lifestyle, which included the picturesque Moon Mountain Residence, annual vacations in southern California, and use of credit cards at major department stores, we are unpersuaded by her claim that she had no reason to know of the subject understatements. A reasonable person in the position of Mrs. Kenney would have inquired about the accuracy of the income reported on the subject returns. Given the fact that the subject returns reported no taxable income, one need only *480 glance at the bottom line to see that further inquiry was warranted. A reason to look is especially present in the instant case because Mrs. Kenney continued to spend large sums of money and live an upper-class lifestyle during those years. A reasonably prudent taxpayer in Mrs. Kenney's position, even knowing only about the money that she had spent, should have known that the stated tax liability was erroneous or that further investigation was warranted. Price v. Commissioner, supra at 965; Stevens v. Commissioner, supra at 1507. Such a reasonable person would have inquired into how the lack of reported income supported his or her family in the manner in which petitioners lived and would have at least asked about the accuracy of the returns. [18] Given the additional fact that Mrs. Kenney knew at the time of the filing of her 1990 Form 1040 that Mr. Kenney was associated with bribes and AZSCAM, Mrs. Kenney has left us hard pressed to conclude that she was an innocent spouse for that year. *481 We also find relevant the fact that much of the unreported income from the Plans which gives rise to the subject understatements was deposited into the accounts on which Mrs. Kenney was writing checks on a frequent and regular basis. Mrs. Kenney could have seen the underlying bank statements with only a negligible effort. If Mr. Kenney or McDonald had refused to show them to her, and the record does not suggest that this was the case, Mrs. Kenney could have easily seen them by visiting the bank. See Edens v. Commissioner, T.C. Memo. 1992-686. Mrs. Kenney argues that she was unsophisticated. We find this argument unpersuasive. Mrs. Kenney was shrewd enough to enter Mr. Kenney's apartment, purchase certificates of deposit, and negotiate $ 200,000 worth of checks that were not in her name. She was clever enough to let her friends use her credit cards and then have them pay her in cash as part of an effort to receive extra cash from Mr. Kenney without his knowledge. Moreover, after listening to Mrs. Kenney testify for approximately 7 hours, we find her to be an articulate and savvy person. Her failure to actually know about the subject understatements *482 resulted from her lack of interest, and not from her inability to make a discovery. Mrs. Kenney also argues that she was raised and taught by her parents and religion merely to raise the children and run the household. Again, we are unpersuaded. Based on the facts at hand, Mrs. Kenney's status as a homemaker is an improper basis on which to contend that she had no reason to know of the understatements. See Stevens v. Commissioner, supra at 1506- 1507; see also Shea v. Commissioner, 780 F.2d 561, 566 (6th Cir. 1986), affg. in part revg. in part, and remanding T.C. Memo. 1984-310. We hold that Mrs. Kenney is not an innocent spouse in either year because she should have known that the subject returns contained substantial understatements of tax. [19] In so holding, we have considered all arguments made by Mrs. Kenney and, to the extent not discussed above, have found them to be without merit. *483 To reflect concessions, Decision will be entered under Rule 155. Footnotes
1. Based on our holding on the first issue above, we need not, and do not, decide this second issue for respondent's alternative determination concerning distributions in 1990.↩
2. During the trial of the innocent spouse issue, Mrs. Kenney elicited testimony from herself, her daughters, and her closest friends. We found much of their testimony to be vague, elusive, uncorroborated, and/or self-serving. Under the circumstances, we are not required to, and we do not, rely on that testimony to support Mrs. Kenney's positions herein. See Ruark v. Commissioner, 449 F.2d 311, 312 (9th Cir. 1971), affg. per curiam T.C. Memo. 1969-48; Clark v. Commissioner, 266 F.2d 698, 708-709 (9th Cir. 1959), affg. in part and remanding T.C. Memo. 1957-129; Tokarski v. Commissioner, 87 T.C. 74, 77↩ (1986).
3. On the applications for many of these cards, Mrs. Kenney misrepresented to prospective creditors that she was a salaried employee of Corporation.↩
4. Mrs. Kenney purchased some of these goods for her friends, who would then reimburse her in cash. Mr. Kenney was unaware that Mrs. Kenney was using the credit cards to purchase goods for nonfamily members, or that Mrs. Kenney received cash reimbursements for these purchases. Mrs. Kenney spent the reimbursed cash for her own personal purposes.↩
5. Petitioners bought the Moon Mountain Residence because they believed it was a good investment and that they could easily resell it.↩
6. Mr. Kenney used these property accounts to keep track of his personal rentals and the renovation of the Moon Mountain Residence. Delia H. McDonald (McDonald), Corporation's secretary, maintained the checks for one of these accounts. At Mrs. Kenney's request, McDonald gave her approximately five to seven checks per week from that account. Mrs. Kenney asked McDonald about the amount of money in the account so that she (Mrs. Kenney) would know her spending limit. Mrs. Kenney expressed minimal interest concerning the source of the money in the property accounts, and her inquiries were never extensive or persistent. Mrs. Kenney never asked McDonald to let her see the bank statements from either account.↩
7. The checks stemmed from the sale of an asset of the MPP.↩
8. Peterson referred to himself as an "associate" of Corporation in these annual reports.↩
9. Peterson was an officer and director in name only. Mr. Kenney generally held Peterson out to the public as Corporation's employee.↩
10. Mr. Kenney could have given Peterson one check from Corporation if Mr. Kenney had so desired.↩
11. Mr. Kenney required McDonald to ask him in advance for her vacation.↩
12. Under Arizona law, Corporation was not required to cover independent contractors. Ariz. Rev. Stat. Ann. sec. 23-902; Home Ins. Co. v. Industrial Commission, 599 P.2d 801↩ (Ariz. 1979).
13. In applying this exclusion, a plan's age and service eligibility conditions may be taken into account only to the extent the conditions are permissible under sec. 410(a)(1). Secs. 1.401(a)(26)-6(b)(1), 1.410(b)-6(b)(1), Income Tax Regs.↩
14. Petitioners ask the Court to order respondent to allow them to correct the Plans' deficiencies under respondent's Voluntary Compliance Resolution Program, which was established by Rev. Proc. 92-89, 1992-2 C.B. 498↩. We refuse to do so.
15. Under Arizona law, a general partner can be held individually liable for the debts of the partnership. Ariz. Rev. Stat. Ann. sec. 29-324↩.
16. Negligence has also been defined as a lack of due care or a failure to do what a reasonable and prudent person would do under similar circumstances. Allen v. Commissioner, 925 F.2d 348, 353 (9th Cir. 1991), affg. 92 T.C. 1↩ (1989).
17. With respect to certain of respondent's adjustments that petitioners stipulated were correct, Mrs. Kenney presented no evidence establishing (and the record does not otherwise show) that she did not know or have reason to know of the understatements in tax attributable to these items. We hold without further discussion that Mrs. Kenney failed to meet her burden of proof with respect to the tax attributable to these adjustments.↩
18. With respect to both years, we are also mindful of the fact that petitioners did not report any taxable income for 5 years in a row. Such an extended absence of taxable income would make a reasonably prudent taxpayer inquire about the accuracy of the information reported on petitioners' 1989 and 1990 returns, given the fact that they continued to enjoy the fruits of a very successful lifestyle.↩
19. Because we have found that Mrs. Kenney does not satisfy the third prong of innocent spouse relief, we need not dwell on whether it would be inequitable to hold her liable for the subject deficiencies. Suffice it to say that the record fails to support her assertion that it would be.↩